IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-03065-NYW-NRN

ABBY WRIGHT,

Plaintiff,

v.

HOBBY LOBBY STORES, INC.,

Defendant.

---

**ORDER ON
DISCOVERY DISPUTE RELATING TO NEUROPSYCHOLOGICAL TESTING**

---

**N. REID NEUREITER**
**United States Magistrate Judge**

This matter comes before the Court on a discovery dispute. Defendant seeks to have Plaintiff undergo a neuropsychological examination pursuant to Rule 35 of the Federal Rules of Civil Procedure. The exam is to be conducted over two days by Dr. Laura Rieffel, Ph. D. The first day would involve a two-hour interview. The second day would involve six hours of evaluative testing.

Plaintiff seeks to impose two conditions on the Rule 35 examination. First, Plaintiff wants access to the raw testing data collected during the neuropsychological examination. Defendant's position is that Dr. Rieffel will only produce that data to a licensed or certified neuropsychologist—not to Plaintiff's counsel.

Second, Plaintiff asks that the two-hour interview and the six-hour neuropsychological testing session be audio-recorded. Plaintiff explains that certain of these tests and test results depend on accurate timing of certain questions (memory-

related questions, for example) and an audio-recording would ensure that proper examination techniques were followed. Defendant, for its part, does not object to recording the interview, but says that audio-recording of the testing session, like video-recording or any kind of third party observation (TPO), is contrary to principles and standards laid down by various professional neuropsychological associations, such as the National Academy of Neuropsychology (NAN), the American Academy of Clinical Neuropsychology (AACN), and the American College of Professional Neuropsychology (ACPN).

There are two concerns articulated by the Defendant, reflecting the positions of these professional associations. Defendant's first concern relates to test security. The suggestion is that the validity of neuropsychological testing is based in part on the fact that the subjects of examination do not know what questions they will be asked or what exercises they will be requested to perform. "Many tests, for example, those of memory or ability to solve novel problems, depend to varying degrees on a lack of familiarity with the test items. Hence, there is a need to maintain test security to protect the uniqueness of these instruments." *Test Security: An Update, Official Statement of the National Academy of Neuropsychology,* approved by the NAN Board of Directors, October 13, 2003. Widespread distribution of neurological testing questions, techniques and raw data may reduce the overall utility of these tests—causing general public harm. *See* Tannahill Glen, Mark Barisa, Rebecca Ready, Edward Peck, Tresa Roebuck Spencer, *Update on Third Party Observers in Neuropsychological Evaluation: An Interorganizational Position Paper*, Archives of Clinical Neuropsychology 36 (2021) 686–92 at 689. ("Inability to perform neuropsychological evaluations that adhere to

ethical and test administration and interpretation guidelines places the general public at risk.").

A related "security" concern is similar, but more proprietary in nature. The tests themselves are copyrighted, and test vendors "note the potential for public harm if test integrity is compromised and note there are limited alternative measurements, should copyrighted and confidential content be released." *Id.* at 690. The claim is that "[Third Party Observers] with a stake in the outcome of the evaluation have a potential incentive to distribute test content which would violate copyright protections and other mandates designed to protect test materials from unnecessary exposure to unqualified persons." *Id.*

These concerns about test security are reflected in NAN's Test Security Appendix, which gives guidelines to clinicians about how to handle requests to release test data. *See* Dkt. 27-2. This document advises that when a clinician is presented with a subpoena-seeking test data, the clinician should "respond in a timely fashion by indicating that complying with the request to release test data under these circumstances places the psychologist in conflict with professional practice guides and ethical principals and places him/her at risk for serious professional sanctions due to the need to maintain test security." *Id.* at 1–2. This Appendix does note that if production is nonetheless ordered, a court order should be issued ensuring that all parties given access be required to maintain the confidentiality of the test data. *Id.*

The second major concern about Plaintiff's requests is that TPO (including, arguably, video or audio-recording) introduces doubts about reliability and validity of test procedures and results. In other words, there is concern that the presence of a third-

party observer will negatively affect the accuracy and utility of the neuropsychological assessment. The presence of a third-party, an extraneous factor, departs from standardized administration procedures because it creates observer effects which are known to affect human performance and test validity. Observer effects, such as distraction of attention of the examinee, are not taken into account in collection of normative data, which therefore may result in inaccurate conclusions pertaining to the extent and severity of abnormal findings. T. Glenn, *Update on Third Party Observers,* at 686.

Defendant also argues that the introduction of any new variables to the testing (whether third-party observers or recording devices) may somehow distort the results in unexpected ways. This is because "[t]ests are developed and standardized in the absence of TPO, and evaluation procedures rely on uniform testing conditions and administration. Introduction of a factor not accounted for in test administration and standardization may jeopardize reliability, validity, and interpretation of assessment results." *Id.* at 688.

Plaintiff supplemented the materials provided to the Court with a 2012 meta-analysis study of available literature examining the effect of the presence of an observer on cognitive task performance. *See* Dkt. #31-4, Angela D. Eastvold, Heather G. Belanger, and Rodney D. Vanderploeg, *Does a Third Party Observer Affect Neuropsychological Test Performance? It Depends*, The Clinical Neuropsychologist, 520–41, 2012, 26 (3). That meta-analysis identified 210 relevant articles of which 62 met inclusion criteria. The meta-analysis conclusion was that the presence of a third-party observer during a psychological test *was* associated with poorer performance.

However, as to "non-human" observers – such as a video or audio-recording device, the meta-analysis noted that very few studies had actually been conducted, and additional inquiry would be needed to draw definitive conclusions:

> Interestingly, a nonhuman observer (audio or video recorder) had a negative impact on performance that was of a medium effect size. One might speculate that the presence of a video recorder increases awareness and attention on self, particularly if the monitor is within plain view. It is also possible that the potential permanency of a recording could induce greater concern about performance. *However, this finding is based on only four studies, two of which were by the same investigator. Therefore, replicability of these findings and confirmation of the magnitude is needed.*

*Id.* at 18 (emphasis added).

### Decision

Rule 35(a) clearly contemplates the imposition of conditions upon an examination. To satisfy the purposes of Rule 35(a), the court may in its discretion enter appropriate protective orders pursuant to Fed. R. Civ. P. 26(c). *Chaparro v. IBP, Inc.*, No. Civ.A. 93–2200–GTV, 1994 WL 714369, at *2 (D. Kan. Dec. 7, 1994). Rule 26(c) grants the court discretionary authority to place appropriate conditions on discovery. *See Thomas v. IBM*, 48 F.3d 478, 482 (10th Cir.1995). It provides that the Court, upon a showing of good cause, "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The party seeking a protective order, however, has the burden to show good cause for it. *Sentry Ins. v. Shivers*, 164 F.R.D. 255, 256 (D. Kan. 1996). To establish good cause, that party must submit "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16 (1981).

As to the production of raw test data to the Plaintiff, the Court agrees with Plaintiff's position that the raw test data should be produced subject to the protective order that is already in place in this case. Under Rule 35, a person examined under the Rule is entitled to receive a report of the examination, including "diagnoses, conclusions, and *the results of any tests.*" Fed. R. Civ. P. 35(b)(2) (emphasis added). In addition, Rule 26(a)(2)(B) states that witnesses who have been retained to provide expert testimony must provide written reports that must contain "the facts or data considered by the witness" in forming their opinions.

Any concerns about test security can be dealt with via the protective order and the designation of the materials to be produced as "confidential." Defendant's desire to produce the raw data only to a "board certified neuropsychologist" does not work in the litigation context. Plaintiff may or may not hire her own expert neuropsychologist, but that does not mean that Plaintiff's counsel should not be entitled to review the raw test data, potentially for use in cross examination of Defendant's expert. Lawyers without formal medical or other specialized training are known to consult learned treatises or textbooks to educate themselves about special areas of expertise for the purpose of cross-examination. Under the Rules, Plaintiff's counsel should have access to the raw test data. The raw data is no more sensitive than an individual's personal medical records, private financial documents, or confidential corporate trade secrets, all of which is routinely exchanged in lawsuits through use of a court-ordered protective order. The Court finds no reason why a protective order cannot safeguard the exchange of confidential test data in this case.

On the issue of audio-recording of the six-hour test (in addition to the two-hour interview), although this is a closer question, the Court agrees that both the interview and second full test day should be audio-recorded. Plaintiff has explained at least one valid reason why recording of the test is important: the timing of certain memory-related questions is significant and may affect the validity of the results. The only way to check the timing is to have an audio-recording of when during the examination those questions are asked.

In our adversarial judicial process, evidence is generally made available to both sides. And it is beyond dispute that a compulsory Rule 35 examination like that is being proposed here is "a procedure embedded in the fundamental adversarial nature of litigation." *Davanzo v. Carnival Cruise Lines*, No. 14-20153-CTV, 2014 WL 1385729, at *2 (S.D. Fla., April 9, 2014); *see also Goggins v. State Farm Mut. Auto. Ins. Co.*, No 3:10-cv-00826, 2011 WL 1660609 (M.D. Fla. May 3, 2011) (describing Rule 35 compulsory examination to be "inextricably intertwined with the adversarial process"); *Gensbauer v. May Dep't Stores Co.*, 184 F.R.D. 552, 553 (E.D. Pa. 1999) (noting that, "in theory, an I.M.E. is to be scientific rather than adversarial, experience suggests it is often the latter").

Along these lines, the Court is in general agreement with the reasoning of the District Court for Boulder County, Colorado, in a decision issued October 16, 2020, that allowed video-recording of a neuropsychological examination. Citing the plaintiff's expert in that case, the court there stated,

> A video recording is an objective and complete memorialization of the exam process and would eliminate the common disputes concerning the accuracy and completeness of the examiners notes and the objectivity of the examiner. The scoring process of a neuropsychological exam, according to

> [Plaintiff's Expert], is nuanced, and susceptible to scoring errors, which would go undetected without the ability to review a video recording of the exam. Furthermore, as an objective record, the video recording can be used by either party in support of their claims and defenses.

Dkt. #31-2, *[Redacted] v. Makhamiv*, Case No. 19cv30456 (Boulder Cnty. Dist. Ct. October 16, 2020). In the instant case, Plaintiff is only asking for audio-recording, rather than the video-recording which was approved in the Boulder County matter.

As to the concern about the "observer effect" adversely influencing or changing the test results, the Court is unconvinced that the risk of distortion of the test results to some small degree outweighs the benefits to the truth-seeking process of having a record of the examination. *See Zabkowicz v. West Bend Co.,* 585 F. Supp. 635, 635 (E.D. Wisc. 1984) (stating that "[i]n the context of an adversary proceeding, the plaintiffs' interest in protecting themselves from unsupervised interrogation by an agent of their opponents outweighs the defendants' interest in making the most effective use of their expert" and ordering the presence of either a third party or a recording device at the examination).

Most of the materials submitted about the adverse effects of third-party observers speak of having a third-party *human* physically present who may have a vested stake in the outcome of the test, such as a lawyer or a parent. The Court accepts that having a person with a stake in the outcome present during the exam might improperly influence the test results, with the examinee potentially looking for confirmation of the "correctness" of the responses being given. But the materials submitted by Defendant seem to lump audio-recording in with the definition of "Third Party Observer." *See*, *e.g.*, Alan Lewandowski, W. John Baker, Brad Sewick, John Knippa, Bradley AxelRod, and Robert J. McCaffrey, *Policy Statement of the American Board of Professional*

*Neuropsychology regarding Third Party Observation and the recording of psychological test administration in neuropsychological evaluations*, 23 Applied Neuropsychology, at 391–98 (Issue 6, 2016) ("Policy Statement") (Defining "Third Party Observation" to include "direct or indirect presence," and "indirect prescence" to include "use of any camera, or audio or video recording device, or any electronic or communication device"). It is also true that some judicial decisions have treated an unattended recording device in the same way as a third party human observer -- as a potentially distracting extraneous influence on the exam. *See Barrett v. Great Haw. Cruises, Inc.*, No. 96–00257 DAE, 1997 WL 862762, at *1–2 (D. Haw. Sept. 17, 1997) (considering the presence of plaintiff's attorney, some other "lay" observer, or a tape recorder as substantially the same condition); *Shirsat v. Mutual Pharmaceutical Co.*, 169 F.R.D. 68, 70 (E.D. Pa. 1996) (finding "that an observer, court reporter, or recording device, would constitute a distraction during the examination and work to diminish the accuracy of the process"); *Tirado v. Erosa*, 158 F.R.D. 294, 299 (S.D.N.Y.1994) (holding that "[t]he introduction of a human or mechanical presence—whether a lawyer, a stenographer, a tape recorder, or other instrumentality—changes the nature of the proceeding, much in the way that television 'coverage' of events qualitatively changes what occurs in front of the camera"); *Tomlin v. Holecek*, 150 F.R.D. 628, 631–32 (D.Minn.1993) (considering the presence of an attorney or a recording device to equate to the presence of a third party). But none of these cases explain in a persuasive way why a recording device, especially an unobtrusive, small audio-recording device, should be treated the same as a human observer.

And Defendant has not presented any persuasive evidence that the presence of an unobtrusive audio-recording device will meaningfully detract from the validity of the test. Today, every smart phone device can also serve as an audio-recording device. Similarly, smart phones today are ubiquitous and are present in almost every venue, including in a doctor's or psychologist's office. No study has been presented showing that the presence of a small and unobtrusive recording device, the size of a smart phone, would have any meaningful impact on neuropsychological test results.

Defendant has presented substantially identical affidavits from six Colorado Ph.D neuropsychologists (including Dr. Rieffel) who assert that "recording a neuropsychological examination is unethical, violates test security and risks rendering neuropsychological tests useless, and is likely to compromise the test results." *See* Dkt. #27-3 at 1–6. These affidavits all conclude with the identical statement that the swearing neuropsychologists do "not know of any neuropsychologist in Colorado who would perform a neuropsychological examination under such circumstances." *Id.*

I find these affidavits unconvincing and self-serving. They are simply cookie-cutter "cut-and-paste" jobs that seem to focus primarily on test security and the need to prevent public dissemination of test materials to ensure that neuropsychological testing continues as a viable technique. In addition, they do not speak at all to the claimed justifications for refusing audio-recording of a neuropsychological examination, or how use of an unobtrusive audio-recording device might differ from human third-party observation. They also only speak to the supposed "likelihood" of the test results being compromised by audio-recording.

Further, I am perplexed by the conclusory statement that the recording of a neuropsychological examination is somehow "unethical." In none of the position statements, nor in the other literature provided, is there any persuasive explanation of why unobtrusive audio-recording, done pursuant to a court order with an appropriate protective order in place, would be a violation of ethical principles. For example, the Policy Statement by the American Board of Professional Neuropsychology, cited above, which appears to provide the basis for asserting it is unethical to conduct an exam in the presence of a TPO, suggests that because there is a "considerable body of research" which supports that third party observation "can affect the accuracy of test findings," to "purposefully disregard its potential impact can be construed as a misrepresentation of the data." *See* Policy Statement. But no one is suggesting that anyone "disregard" the potential impact that the presence of an audio-recording might have on examination results. Instead, just as there may be some impact on an examination of having a foreign-language interpreter present for an examination, presumably the results would note the presence of the third party (or audio-recording device) and the potential impact of such presence.

Indeed, the same Policy Statement explains that while conducting an examination without any TPO present is ideal, some circumstances may require the presence of a "Third Party Assistant," without whom the examination could not take place. Examples might include,

> a child with suspected or diagnosed autism, developmental disorders affecting intelligence, confirmed brain injury that precludes independent living, children who are either too young or severely anxious that they cannot be left alone, elderly adults with compromised cognition who are unwilling to participate without the presence of a trusted family member or

friend, or patients who have a thought disorder impacting reality testing, among others.

*Id.* Language barriers may also require the presence of a foreign language or sign interpreter. *Id.* In addition, training situations where psychology students or technicians are learning the administration of test procedures may sometimes be present during the administration of exams without violating ethical principles or compromising the results. *Id.* The way to deal ethically with such potential distractions is to explain in any report the presence of the third party: "In the aforementioned cases, the examiner is ethically required to document in the neuropsychological report the use of a [third party assistant] and any deviations of standardization or modifications in test administration. The limitations of normative data with subsequent impact on the generalization of findings should be clearly noted." *Id.* The same could and should be done in the event of an audio-recorded examination.

The same Policy Statement emphasizes that texts on psychological testing "have long cited the need to conduct testing in a distraction-free environment," citing as an example the Wechsler Intelligence Scale for Children-Fourth Edition (WISC-IV), "which advises that no one other than the examiner and the examinee should be in the room during test administration." The Policy Statement explains that "[b]y eliminating the presence of third parties, the examiner eliminates potential interference and the possibility of their distracting from or influencing the testing process, hence variables that are inconsistent with test standardization." Again, to equate a small, unobtrusive recording device, which could be turned on and off by the tester herself (or even remotely), with the distracting physical presence of a third-party individual seems an inappropriate logical leap. *See Davanzo*, 2014 WL 1385729, at *4 (explaining that an

audio-recording of a portion of an exam, "is far less intrusive and distracting than permitting an attorney, a court reporter, a videographer, or another physician to attend the examination").

Obviously, distribution of the confidential test materials or the substance of the test in violation of contractual or other obligations would be unethical. This too is emphasized in the Policy Statement. *See* Policy Statement ("Test security is a critical issue, as it addresses the prevention of unnecessary exposure of psychometric materials that can result in diminishing a test's ability to accurately distinguish between normal and abnormal performance. . . it is incumbent on neuropsychologists to protect the integrity of psychological test materials."). But it is not clear how it would be unethical to conduct a test with an audio-recording device in the examination room, pursuant to a court-issued protective order to prevent the unauthorized dissemination of the test questions or raw data.

The affidavits submitted by the Defendant are also self-serving. The point of the proposed recording of the neuropsychological examination is to be able to verify that the test is conducted properly, is consistent with professional standards, and no unfair advantage is taken of the examinee. It is an inevitable aspect of our adversary litigation system that parts of a recorded examination could be profitably used at trial or deposition to cross-examine the person conducting the exam. The cookie-cutter affidavits may be viewed as attempts to insulate the examination procedures from any objective review or potential cross-examination at trial.

In addition, the affidavits contain a veiled suggestion that if the Court were to require recording of the exam, the proposed expert psychologist would refuse to

conduct the examination. This is not an acceptable basis for declining to impose an otherwise appropriate condition on a Rule 35 examination. It would create a situation where "the tail was truly wagging the dog, as the Court's ability to fashion appropriate conditions would be made contingent upon what the defense counsel's expert said was acceptable to him." *Maldonado v. Union Pac. R.R. Co.*, No. 09-1187-EFM, 2011 WL 841423, at *4 (D. Kan. March 8, 2011) (deciding to grant little weight to the fact that defense counsel's expert had decided not to examine the plaintiff because the examination will be recorded)

The decisions on whether a Rule 35 should be video or audio-recorded differ across the country. Some courts have allowed the recording of the neuropsychological examination. *See Zabkowwicz v. West Bend Co.*, 585 F. Supp. 635, 636 (E.D. Wis. 1984) (finding that Rule 35 interview could be recorded because, "in the context of an adversary proceeding, the plaintiffs' interest in protecting themselves from unsupervised interrogation by an agent of their opponents outweighs the defendants' interest in making the most effective use of their expert"). That said, the general federal rule appears to be that neuropsychological examinations should not be conducted in the presence of a third party (including audio or video recording) absent unusual circumstances, such as the need for a for an interpreter. *See*, *e.g.*, *Maldonado*, 2011 WL 841432 (overruling objection to magistrate judge decision to allow recording of neuropsychological examination because of need for interpreter and plaintiff's cognitive ability had decreased, impairing plaintiff's ability to communicate with his lawyer about what had occurred during the examination); *Di Bari v. Incaica Cia Armadora, S.A.,* 126 F.R.D. 12, 13 (E.D.N.Y. 1989) (stenographer allowed at psychiatric examination when it

appeared that plaintiff, who was not fluent in English, would have difficulty communicating with his attorney). There are three reasons federal courts give. Court are reluctant to permit a third party recording out of concern that the intrusion would "(1) potentially invalidate the examination results; (2) fail to provide a 'level playing field,' as plaintiff was not required to tape record his examinations with his own health care providers; and (3) inject a greater degree of the adversary process into an evaluation that is to be neutral." *Mayorga Martinez v. United States*, CV 17-8810 FMO (SS), 2019 WL 4277803, at *4 (C.D. Cal. April 10, 2019) (quoting *Galieti v. State Farm Mut. Automobile Ins. Co.*, 154 F.R.D. 262, 265 (D. Colo. 1994)).

In this Court, the rule appears to be that there "should be no presumption either way," but that the party "seeking the presence of a third party or recording device must carry the burden of convincing the court." *Galieti*, 154 F.R.D. at 265 (denying motion to require recoding of examination based on affidavit from examining doctor that it would "prevent [the plaintiff] from focusing on the examination itself" and there was no information presented by the plaintiff to suggest the examining doctor would be less than impartial).

Having reviewed the caselaw and the materials submitted by the Parties, the Court is persuaded it would be beneficial to the truth-seeking process in this case to have an audio-recording of the entire examination, both on the first and second days.

At the examining doctor's option, she may audio-record the evaluation or, if she chooses not to do so, Plaintiff (through counsel) may elect to audio-record the evaluation on her own recording device. But, no third persons shall be allowed to attend the exam on Plaintiff's behalf for the purpose of audio-recording the evaluation. Audio-

recording of the evaluation should be done in a manner so as not to interfere with or obstruct the evaluation. Within ten (10) days after completion of the evaluation, a copy of the audio-recording should be provided to the opposing party. The audio-recording shall be governed by the protective order in this case and unauthorized distribution of the recording, or use of the recording for any purpose other than this case shall be punishable by contempt of court.

      **So Ordered.**

Date: August 7, 2023

_____
N. Reid Neureiter
United States Magistrate Judge